**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **MEHREZ HACHED** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **CIVIL ACTION NO. 4:21-cv-528** |
| vs. | § | |
| | § | |
| **HONEYWELL INTERNATIONAL,** | § | |
| **INC. d/b/a/ HONEYWELL, INC.,** | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF MEHREZ HACHED'S ORIGINAL COMPLAINT
FOR EQUITABLE AND MONETARY RELIEF
UNDER TITLE VII AND SECTION 1981**

Plaintiff Mehrez Hached, by his attorney, files this complaint against Defendant Honeywell, Inc., alleging as follows:

**JURISDICTION AND VENUE**

1. This action arises under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. 2000e, *et seq.*; the Civil Rights Act of 1871, codified at 42 U.S.C. Section 1981 (both as modified by the Civil Rights Attorney's Fee Awards Act of 1976 (42 U.S.C.A. § 1988[b])); and the Americans with Disabilities Act. Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a), (b).

2. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) and (3) as the matter's key events occurred in Plano, Texas, within this District and Division.

**PARTIES**

3. Plaintiff Mehrez Hached, Ph.D. was a resident of Texas during the events involved in this matter. Dr. Hached is a citizen of Canada and currently resides in Ontario, Canada.

4. Defendant Honeywell International, Inc. d/b/a Honeywell, Inc. (Honeywell), is a Delaware corporation with its headquarters and nerve center located in New Jersey. It can be served through its registered agent:

> Corporation Service Company
> 211 E. 7th Street, Suite 620
> Austin, TX 78701

## DEFENDANT'S UNLAWFUL CONDUCT

5. Mehrez Hached, PhD, was wrongfully terminated in violation of the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964 (gender and race/national origin discrimination), Section 1981 of the Civil Rights of 1871 (race/national origin discrimination) and/or the Americans with Disabilities Act (perceived disabled).

6. Dr. Hached, was employed by Defendant Honeywell through its Honeywell of Canada division/subsidiary from February 2014 to December of 2018. Dr. Hached worked as General Manager, Honeywell Enterprise Mobility division, for Honeywell's USA subsidiary, working from Plano Texas, from 2018 until his August 3, 2020, wrongful termination.

7. Prior to his wrongful termination, Dr. Hached had a successful managerial career and was responsible for the whole business of Honeywell Managed Mobility Services, including:

   a. Global responsibility for P&L;

   b. Full transformation of the business across all functions;

   c. Dramatically reduced the business loss within 9 months; and

   d. Positioned the business for long term growth and profitability.

8. On or about, February 7, 2020, Dr. Hached was placed on Administrative Leave, allegedly for an investigation of an alleged complaint against him. The source of the complaint was an employee who was about to be placed on a Performance Improvement Plan (PIP). This

complaint was supported by another employee who was already on a PIP. Both the complainant and her supporter were female employees.

9. At all times, Dr. Hached had been working closely with Human Resources personnel to ensure that the proper HR procedures and protocols were followed, and there was no substance to the allegations against him. He did not preside over or tolerate any form of illegal harassment or discrimination. He did, however, expect his subordinate employees to produce quality work for quality pay. HR approved Dr. Hached's proposed PIPs of one of the female employees.

10. Also, during the preparation of these PIPs, Tony Washington, a senior human resource professional warned Dr. Hached that it was risky for a male manager to place two female employees on PIPs, implying that just because they were females that they could make a complaint against Dr. Hached. Washington also asked if Dr. Hached had any other females who report to him. Dr. Hached responded that he did not discriminate and had other highly ranked female employees who were highly ranked because they did a good job. Even though the performance of the complainants was truly poor and deserving of the PIPs, Washington warned of the risk of disciplining the female employees. Subsequently, Washington was the person who led the so-called investigation on the baseless complaints against Dr. Hached.

11. Of the two employees who filed and supported the alleged complaint, the complainant had demonstrated a racial bias against Dr. Hached and had even told a partner that she thought that given Dr. Hached's accent, he should not be dealing with customers directly. Accordingly, the entire investigation was tainted by this complainant's racial/national origin animus under the Cat's Paw theory of discrimination.

12. Although Honeywell should have discovered this animus, it failed to do so, and thus took no action to separate itself from this complainant's animus or the Cat's Paw Theory of liability based on her animus.

13. While on administrative leave, Dr. Hached applied for and received short term disability for the exacerbation to his diabetes caused by being placed on administrative leave and being falsely charged. Based on the STD approval, Honeywell perceived Dr. Hached as disabled.

14. At the beginning of his administrative leave, there were issues related to a Human Resources investigation regarding certain false allegations against him involving managerial decisions.

15. Dr. Hached was provided no transparency into the substance of the allegations against him and was never told the exact nature of the alleged complaints. During his administrative leave, he was never asked any additional questions or given the ability to present his evidence as to what had really occurred.

16. Upon reaching the end of his STD, Dr. Hached communicated his readiness to return to work, but instead was terminated. The alleged basis for his termination was:

   a. the false claim that he had allegedly released confidential information regarding a Client/Partner of Honeywell; and

   b. the false claim that he had allegedly engaged in inappropriate conduct relating to two female subordinates.

17. However, both allegations are false, and Honeywell knew, or reasonably should have known, that the grounds were false prior to terminating Dr. Hached.

18. Following his termination, Dr. Hached was allowed to present evidence in an attempt to keep his job.

19. As to the first issue, which was identified as the primary issue, the alleged release of data, Dr. Hached informed Honeywell of the following information:

   a. The release of allegedly confidential data was requested by the client and authorized by the Client/Partner acting through its representative prior to the disclosure;

   b. The purpose of the released data was to further assist in "closing a sale;"

   c. The release of data most likely would come from a subordinate of Dr. Hached because primary communication on that account was not through Dr. Hached;

   d. Honeywell Legal was fully aware that the customer had requested that the Master Service Agreement in this relationship be directly between the customer and Honeywell and not with the Client/Partner. The Client/Partner was in agreement for the contract with this customer to be in the name and under the logo of Honeywell.

   e. Accordingly, Honeywell Legal knew or should have known that confidential information of the Client/Partner would necessarily be revealed to the customer under the Honeywell logo.

   f. Related to this Master Service Agreement and customer, it was the responsibility of the individual sales lead to properly follow the process and validate the pricing schedule with the Client/Partner prior to submitting it to the customer. In this case, that sales lead was the complainant who had filed a complaint against Dr. Hached. Further, Dr. Hached was not responsible for micro-managing the information distribution process, and he did not directly provide any information directly to this customer. Accordingly, if any improper

information was sent to the Customer, which is denied, it was the action of the complainant or another who released such data, and not Dr. Hached.

g. The so-called investigation into this issue was basically non-existent in that the team members who can verify the release of information was fully approved by the Client/Partner's representative were not asked questions regarding the release of the information.

h. The information Dr. Hached provided to Honeywell so that it could verify that the data provided to the customer was approved by the Client/Partner included the names of the customer, Client/Partner, and particular witnesses within Honeywell. However, to preserve the confidentiality of the customer, Client/Partner and witnesses, this information is not included in this Complaint.

20. More specifically:

a. The day that Dr. Hached was placed on leave, two HR professionals asked him questions, but did not identify the focus of the investigation;

b. When the conversation was over, Honeywell's HR professionals took his computer, which effectively prevented Dr. Hached from obtaining or providing email evidence to exonerate himself;

c. At that time, when asked, he explained to these two HR professionals the process of how this particular account occurred, the process of how and why the data in question was shared with a potential customer, and that all information shared was authorized by the client;

    d. After that day, Dr. Hached sent these HR professionals one or more emails seeking to know the grounds and the topics of the investigation and providing names of individuals that he believed should be questioned;

    e. The verifiable proof that client in question had approved the disclosure would have been found from two possible sources if Honeywell had sought to verify the truth;

        i. Testimony from Honeywell's Sales Team for that client (each of whom Dr. Hached had identified by name), and

        ii. Testimony from the management team related to this client (each of whom Dr. Hached had identified by name).

    f. However, the Honeywell investigation did not ask any questions on this specific topic to the members of the Honeywell sales team in question who were knowledgeable about the release.

21. Regarding the second allegation, concerning alleged harassment, Dr. Hached informed Honeywell that:

    a. Both the complainant and her supporter knew their jobs were on the line due to poor performance (and were thus motivated by financial bias);

    b. The complainant had made biased statements about Dr. Hached based on his race/ethnicity/national origin due to his accent;

    c. These statements were forwarded to Dr. Hached by a Client/Partner entity of Honeywell. Dr. Hached then forwarded the email that described the biased statements to Honeywell.

22. That Mr. Washington, a Honeywell senior human resources employee, told Dr. Hached that the mere fact Dr. Hached was enforcing work rules against two female employees through using the PIP process was sufficient grounds for the employees to file a complaint against Dr. Hached, shows a remarkable misunderstanding of EEO law, and demonstrates a pattern of preferring the testimony of female employees over a male employee without any factual basis for doing so in particular instances, and is a pattern and practice of Honeywell that is maintained with malice or with reckless indifference to the federally protected rights of male employees.

23. In this case, the discriminatory and/or retaliatory conduct of the complainant against Dr. Hached was a significant influence in terminating Dr. Hached. Title VII requires the discrimination to be a motivating factor in the termination, and in this instance the discrimination of this complainant is held against Honeywell as a motivating factor under the Cat's Paw theory.

24. Accordingly, the charges against Dr. Hached were false; Honeywell knew or should have known they were false, and wrongfully terminated Dr. Hached despite their falseness. Thus, the charges were false pretexts for discrimination based on gender, disability, or race/ethnicity/national origin.

25. On or about October 14, 2020, Dr. Hached filed a charge of discrimination with the EEOC containing substantially all of the above facts. These facts place Defendant on notice of claims of gender discrimination, race and national origin discrimination, and disability discrimination. Dr. Hached received a right to sue letter on April 19, 2021. However, the cover page did not check all of the above boxes.

26. On or about May 28, 2021, Dr. Hached filed a supplemental charge of discrimination with the EEOC containing substantially all of the above facts. This second supplement charge did check all of the appropriate boxes. Upon reviewing the charge and

determining the claims were essentially identical to the prior charge, the EEOC amended the prior charge and reissued Dr. Hached a right to sue letter.

## THE LAW

27. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, national origin, religion, and other classifications, as well as retaliation based on opposition to activities made unlawful by Title VII.

28. Specifically, 42 U.S.C. § 2000e-2 (a) states:

(a) Employer practices

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

29. Further, 42 U.S.C. 2000e-3 (a) states:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on—the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

30. Compensatory and punitive damages may be awarded in cases involving intentional discrimination based on a person's race, color, national origin, sex, religion, disability, or genetic information.

31. Compensatory damages pay victims for out-of-pocket expenses caused by the discrimination (such as costs associated with a job search or medical expenses) and compensate them for any emotional harm suffered (such as mental anguish, inconvenience, or loss of enjoyment of life). *See e.g., Zamora v. City of Houston*, 798 F.3d 326, 335 (5th Cir. 2016) (compensatory damages included mental anguish, emotional distress, and damage to reputation).

32. Punitive damages may be awarded to punish an employer who has committed a malicious or recklessly indifferent act of discrimination.

33. Specifically, 42 U.S.C. 2000e-5 (g) and (k) state:

(g) Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders

> (1) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

(k) Attorney's fee; liability of Commission and United States for costs

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

34. Additionally, 42 U.S.C. § 1981a states:

(a) RIGHT OF RECOVERY

(1) CIVIL RIGHTS

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C. 2000e–2, 2000e–3, 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

…

(b) COMPENSATORY AND PUNITIVE DAMAGES

(1) DETERMINATION OF PUNITIVE DAMAGES

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

35. In *Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186 (2011), the Supreme Court determined that an employer should be held liable for employment discrimination based on the discriminatory animus of an employee, who influenced, but did not make, the ultimate employment decision. This doctrine is commonly referred to as "Cat's Paw."

36. Cat's Paw theory applies to Title VII claims, as evidenced in *Zamora v. City Of Houston*, 798 F.3d 326, 331-32 (5th Cir. 2015) (holding cat's paw analysis applies in Fifth Circuit to Title VII cases); and, *Holcomb v. Iona Coll*., 521 F.3d 130, 143 (2d Cir. 2008) (holding a Title VII plaintiff can succeed "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision-making] process" (citation omitted).

37. Under the Cat's Paw analysis, "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision ... so long as the individual shown to have the impermissible bias played a meaningful role" in the employment action. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).

38. When a supervisor or manager takes actions motivated by retaliatory animus that are intended to cause an adverse employment action and do cause that action, this conduct is sufficient to allow the conclusion that the employment decision, even if made by a different actor, is tainted by the same illegal bias or motive. *Zamora*, 798 F.3d at 332 (holding evidence of supervisor's animus was sufficient to show other City actor's decision was illegal).

39. It is evident through his prima facie case for discrimination that Dr. Hached experienced bias towards his Middle Eastern national origin and/or race, both of which played a meaningful role in the ultimate decision to terminate his employment. Regardless of the intentions of the final decision maker, the bias of one of the complainants against his race/national origin, has tainted Honeywell's action.

40. Hached asserts that based on both Cat's Paw liability and/or general vicarious liability law, including under *Respondeat Superior* theory, that Honeywell is liable for the actions taken by its managers and employees acting with improper discriminatory or retaliatory animus.

41. A corporate defendant may be liable for intentional discrimination by an employee through *respondeat superior,* or vicarious liability. *See Green v. Albertson's, Inc.,* 67 Fed.Appx. 248 (5th Cir 2003), citing *Arguello v. Conoco, Inc.,* 207 F.3d 803, 810 (5th Cir.2000) (discussing 42 U.S.C. §§ 1981, 1982, and 2000a).

42. Vicarious liability under Section 1981 includes ratification liability. *See*, *e.g.*, *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 409 (6th Cir. 1999) (To succeed on

a claim of vicarious liability a plaintiff must "adduce specific evidence that the defendant 'instigated, supported, ratified, or encouraged' those actions … .'").

43. While there are some differences between Section 1981 and Title VII cases, the Fifth Circuit has long held that claims of intentional discrimination, which include racial discrimination and retaliation claims based on 42 U.S.C. § 1981, are analyzed for liability under the same rubric of analysis as Title VII cases. *See, e.g., Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 422 n. 1 (5th Cir.2000); *Harrington v. Harris,* 118 F.3d 359, 367 (5th Cir.1997); *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir.1996); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996); *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 n. 7 (5th Cir.1994).

44. Accordingly, unless otherwise noted, Plaintiff will cite to both Section 1981 and Title VII cases for their precedential value to the Plaintiff's Section 1981 case.

45. As for Plaintiff's racial claim under Section 1981, Dr. Hached's designation as Arab/Middle Eastern is sufficient to state a protected race and/or national origin claim under Section 1981 according to Fifth Circuit precedent. *See Jatoi v. Hurst-Euless-Bedford Hosp. Authority*, 807 F.2d 1214, 1219 (1987). As the Fifth Circuit stated in *Jatoi*:

> [This] circuit has refused to limit the protection of § 1981 to taxonomically defined racial groups. *Alizadeh v. Safeway Stores, Inc.,* 802 F.2d 111, 115 (5th Cir.1986) (adopting the analysis in *Al-Kyazraji v. Saint Francis College,* 784 F.2d 505, 514–18 (3d Cir.1986)). Tocome within § 1981, a plaintiff need only allege he suffered discrimination based on his membership in a group that is commonly perceived to be "racial" because it is ethnically and physiognomically distinct. *Id. Al-Khazraji* interprets the statute to mandate that all persons be treated equally without regard to color or race. A label cannot control the substance of an action if we are to be obedient to the legislative purpose of § 1981. Dr. Jatoi's assertion that he is East Indian is sufficient to put him within the statute's protection. [footnote omitted].

> The defendants also contend that Dr. Jatoi must explicitly plead he suffered *racial* discrimination in order to state a claim under § 1981. We have recognized the difficulty in distinguishing discrimination based on national origin from that based on race. *Bullard*

*v. Omi Georgia, Inc.,* 640 F.2d 632, 634 (5th Cir.1981). Consistency requires that our analysis regarding the definition of a protected group control this issue as well. When a plaintiff asserts he has suffered discrimination based on his membership in a group that is commonly perceived as "racial" because it is ethnically and physiognomically distinct, we will treat the case as asserting a claim under § 1981 whether he labels that discrimination as based on "national origin" or on "race."

*Id.*

46. The Supreme Court has held that a plaintiff in a Section 1981 action is entitled to punitive damages "under certain circumstances." Such circumstances include when the defendant acted with malice or reckless indifference to the plaintiff's federally protected rights to be free from discriminatory or retaliatory conduct. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 54546 (1999). To recover punitive damages against Honeywell, Hached may impute vicarious liability for punitive damages through the actions of an employee acting in a "managerial capacity" with such malice or reckless indifference. *Kolstad,* 527 U.S. at 539. Unlike in Title VII cases, there are no limits on punitive damages in Section 1981 cases. Punitive damages are a legal question for the jury.

47. The Americans with Disabilities Act follows the same principles of liability as Title VII regarding such factors as the standards of proof, Cat's Paw theory, and vicarious liability. *See, e.g., Shepherd v. Goodwill Industries of South Texas, Inc.*, 872 F.Supp.2d 569, 580-81 (S.D. Tex. 2011) (applying Cat's Paw theory, vicarious liability, and the *McDonnell Douglass prima facie* case analysis, to an ADA case).

**FIRST CLAIM FOR RELIEF**
**(Gender Discrimination under Title VII)**

48. Plaintiff realleges each allegation set forth in the paragraphs above.

49. This claim for relief is asserted in addition to, or in the alternative of, Dr. Hached's other claims for relief.

50. Defendant terminated Plaintiff, in whole or in part, because of his gender - male. Defendant's human resources employee expressly stated that when a female employee files a complaint against a male employee, Honeywell always sides with the female. Here Honeywell did just that despite sufficient evidence that Dr. Hached had done no wrong and the complaints against him were meritless.

51. Defendant's termination of Plaintiff was committed with malice or reckless indifference to Plaintiff's rights.

52. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendant for wrongful termination based on gender discrimination in violation of Title VII, 42 U.S.C. 2000e-2(a).

53. Plaintiff seeks and requests that the Court award back pay, that is, the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

**SECOND CLAIM FOR RELIEF**
**(Race/National Origin Discrimination under Title VII)**

54. Plaintiff realleges each allegation set forth in the paragraphs above.

55. This claim for relief is asserted in addition to, or in the alternative of, Dr. Hached's other claims for relief.

56. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendant for retaliatory discharge pursuant to Title VII because of his race/national origin: Arab/Middle Eastern, in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e-3.

57. Among other items, one of the complainants against Dr. Hached displayed open anti-middle eastern bias. Even so, Honeywell ignored that bias in its investigation. Accordingly, Honeywell's decision is tainted by that bias under the Cat's Paw Theory.

58. Defendant's termination of Plaintiff was committed with malice or reckless indifference to Plaintiff's rights.

59. Plaintiff seeks and requests that the Court award back pay, that is, the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

## THIRD CLAIM FOR RELIEF
### (Race/National Origin Discrimination under Section 1981)

60. Plaintiff realleges each allegation set forth in the paragraphs above.

61. This claim for relief is asserted in addition to, or in the alternative of, Dr. Hached's other claims for relief.

62. Defendant terminated Plaintiff, in whole or in part, because of his race and/or national origin: Arab/Middle Eastern.

63. Defendant's termination of Plaintiff was committed with malice or reckless indifference to Plaintiff's rights.

64. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendant for wrongful termination based on discrimination in violation of 42 U.S.C. Section 1981.

65. Plaintiff seeks and requests that the Court award back pay, that is, the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

## FOURTH CLAIM FOR RELIEF
### (Disability Discrimination under the Americans with Disabilities Act)

66. Plaintiff realleges each allegation set forth in the paragraphs above.

67. This claim for relief is asserted in addition to, or in the alternative of, Dr. Hached's other claims for relief.

68. Defendant terminated Plaintiff, in whole or in part, because of perceived disability.

69. Defendant's termination of Plaintiff was committed with malice or reckless indifference to Plaintiff's rights.

70. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendant for wrongful termination based on perceived disability discrimination in violation of the Americans with Disabilities Act. 42 U.S.C. § 12101, *et. seq.*

71. Plaintiff seeks and requests that the Court award back pay, that is, the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of

enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover Judgment against Defendant Honeywell pursuant to Title VII, Section 1981, the Americans with Disabilities Act, with the following relief:

(1) Past and future pecuniary losses, and lost wages from the time of termination until the time of trial;

(2) Equitable reinstatement; or alternatively, if the Court makes an equitable finding that reinstatement is not feasible, that the Court award the equitable remedy of front pay including loss of wages in the future and loss of future earnings capacity;

(3) Compensatory damages, including damages for past and future mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life, emotional distress, physical distress, damage to reputation, and other nonpecuniary losses;

(4) Punitive damages;

(5) Prejudgment and post-judgment interest at the maximum legal rate;

(6) Costs of Court;

(7) Attorneys' fees; and

(8) All such other and further relief in law or equity to which Plaintiff may be justly entitled.

RESPECTFULLY SUBMITTED,

*/s/ Eric N. Roberson*

_____
Eric Roberson

**PLAINTIFF'S ORIGINAL COMPLAINT - 18 OF 19**

        Texas State Bar No. 00792803
        Kilgore & Kilgore, PLLC
        3109 Carlisle Street
        Dallas, TX 75204
        214-379-0817 Direct
        214.969.9099
        214.379.0843 Fax
        ENR@KilgoreLaw.com
        **ATTORNEY FOR PLAINTIFF**
        **MEHREZ HACHED**